UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| NORMA LYNN FERGUSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   4:19-cv-1393-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Norma Lynn Ferguson seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The court carefully considered the record, and for the reasons expressed herein, the court **REVERSES** the Commissioner's decision and **REMANDS** for further consideration.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20

C.F.R. § 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ferguson, age 47 on the alleged disability onset date, protectively filed an application for a period of disability and disability insurance benefits on April 15, 2016, alleging disability as of March 22, 2016.  (Tr. 10, 133, 268-69).  The Commissioner denied her claims, and Ferguson timely filed a request for hearing on June 7, 2016.  (Tr. 148-61, 171-72).  The Administrative Law Judge ("ALJ") held two hearings, on February 14, 2018, and May 3, 2018.  (Tr. 113-47).  The ALJ issued an opinion on August 16, 2018, denying Ferguson's claim.  (Tr. 10-22).

Applying the five-step sequential process, the ALJ found at step one that Ferguson did not engage in substantial gainful activity after March 22, 2016, her alleged onset date.  (Tr. 13).  At step two, the ALJ found Ferguson had the following severe impairments: degenerative disc disease, obstructive sleep apnea, migraine headaches, obesity, psoriatic arthritis, and temporomandibular joint syndrome ("TMJ").  (Tr. 13-15).  The ALJ further found that Ferguson's medically determinable impairments of asthma, anxiety, history of substance abuse, depression, restless leg syndrome, hypothyroidism, Parkinson's disease, fatty liver, diverticulitis, and narcolepsy, considered singly and in combination, as non-severe.  (Tr. 14-15).  At step three, the ALJ found that Ferguson's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15-16).

Next, the ALJ found that Ferguson exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b), unskilled, not requiring complex instructions or procedures, with no climbing of ropes, ladders, or scaffolds, with no working at unprotected heights or with hazardous machinery, with occasional stooping, crouching, crawling, or kneeling, with occasional balancing, with no concentrated exposure to dust, fumes or other respiratory irritants, with no concentrated exposure to extreme heat or cold, without exposure to direct sunlight due to headaches, with reasonable access (on premises) to restroom facilities at the usual and customary breaks, with frequent interaction with coworkers and supervisors but occasional contact with the general public.

(Tr. 16).

At step four, the ALJ determined Ferguson did not retain the ability to perform her past relevant work as a schoolteacher.   (Tr. 20).   At step five, the ALJ determined Ferguson could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC.   (Tr. 21).   Accordingly, the ALJ determined that Ferguson has not suffered a disability, as defined by the Social Security Act, since March 22, 2016.   (Tr. 21).

Ferguson timely requested review of the ALJ's decision.   (Tr. 265-67).   On July 18, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-6).   On August 26, 2019, Ferguson filed her complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Ferguson lodges five arguments: (1) the ALJ improperly considered the opinions of two treating physicians, Dr. Mellick and Dr. Vollberg; (2) the ALJ failed to consider all of her severe impairments; (3) the ALJ failed to adequately consider Ferguson's testimony concerning the side effects of her medication; (4) the Appeals Council erroneously held that new evidence did not show a reasonable probability it would change the outcome of the decision; and (5) the ALJ's reliance on the vocational expert's testimony was in error because it was not based on a correct or full statement of Ferguson's limitations and impairments.   (Doc. 10 at 35-55).

The court starts with the first issue, and while the court disagrees with Ferguson regarding the ALJ's consideration of Dr. Mellick's opinion, the ALJ's discussion of Dr. Vollberg's opinion is problematic.   This conclusion warrants remand.

## I.     The ALJ Assigned Proper Weight to the Treating Physicians' Opinions

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.*

An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* An ALJ does not commit reversible error when (1) she articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d at 1212.

To determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole"). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

## A.   The ALJ Properly Considered the Opinion of Dr. Mellick

Ferguson first argues the ALJ improperly discounted the opinions of treating physician Dr. Gary Mellick. Ferguson contends Dr. Mellick's opinion is "well supported by his treatment records." (Doc. 10 at 36-37). The court disagrees.

Dr. Mellick works at the Dekalb Neurology & Sleep clinic and treats Ferguson for obstructive sleep apnea and Parkinson's disease for the period 2014 to 2016.[2]   (Tr. 418–29, 618–58, 703–09).   On January 19, 2017, Dr. Mellick completed a Physical Capacities Form regarding Ferguson.   (Tr. 796).   The form asks a series of questions to which Dr. Mellick either circled a response, filled in a blank, or checked yes or no. (*Id.*).   Dr. Mellick indicated Ferguson could sit upright in a standard chair for less than 30 minutes at one time and that she could stand for one hour at a time.   (*Id.*)   He further estimated Ferguson would be "lying down, sleeping, or sitting with legs propped up at waist level or above, due to her medical conditions" for six hours during an eight-hour daytime period.   (*Id.*)   Dr. Mellick opined Ferguson would be off-task 100 percent of the time during an eight-hour day, and she would fail to report to work 30 out of 30 days due to her physical symptoms.   (*Id.*)   He listed the following conditions as causing these limitations: Parkinson's disease, sleep apnea, hypersomnia, Crohns[3]

---

[2] The record depicts that Ferguson presented at Dr. Mellick's office in January 2017 "to get a paper filled out for her disability."   (Tr. 793).   The relevant records do not portray that Dr. Mellick evaluated or treated Ferguson during this visit.   (Tr. 793–95).   Further, as discussed below, Ferguson returned for appointments with Dr. Mellick in October and December 2018 – the records of which postdate the ALJ's decision.   (Tr. 99–112).   Therefore, the court will not assess these records in the instant analysis.

[3] The court assumes this represents what is written on the form.   The doctor's handwriting is somewhat illegible on this portion of the form. The court fails to discern that Dr. Mellick – or any other physician – ever treated Ferguson for Crohn's disease.   Crohn's disease constitutes an "inflammatory bowel disease" that induces diarrhea, abdominal cramps, blood in the stool, fever, fatigue,     loss     of     appetite,     weight     loss,     and     frequent     bowel     movements.

disease, and REM behavioral disorder.   (*Id.*)   He listed nausea as a medication side effect.   (*Id.*)

The ALJ assigned little weight to the opinion of Dr. Mellick.  (Tr. 19).   He noted Dr. Mellick "treated the claimant for a sleep disorder and noted after she had had a CPAP machine for several weeks she was 'feeling better' and 'not falling asleep during the day as much.'"   (*Id.*)   The ALJ stated these notes were inconsistent with the opinion that Ferguson would be off task 100 percent of the time during an eight-hour daytime period.   (*Id.*)

The ALJ has demonstrated the good cause required for assigning little weight to the physical capacities form completed by Dr. Mellick.   The court first notes the opinion form constitutes a series of questions where Dr. Mellick circled responses or filled in provided blanks with no explanation for the answers given.   (Tr. 796). Without explanation or extrapolation from Dr. Mellick, the form bears little probative value.   Indeed, several courts have criticized "form reports" such as the one Dr. Mellick provided where a physician merely checks off a list of symptoms without providing an explanation of the evidence that supports the decision.   *See Wilkerson ex rel. R.S. v. Astrue*, No. 2:11-CV-2556-LSC, 2012 WL 2924023, at \*3 (N.D. Ala. July 16,

---

https://www.healthline.com/health/crohns-disease#symptoms (last visited July 16, 2020).   Aside from fatigue, the medical evidence of record portrays that Ferguson consistently denied experiencing the afore-cited symptoms.   (Tr. 623, 629, 634, 640, 678, 682, 686, 707, 803, 807, 813, 823, 835, 839, 844, 934, 940, 943, 951).

2012) ("form report completed by Dr. Morgan and submitted by [plaintiff]'s counsel consisted of a series of conclusory 'check-offs' devoid of any objective medical findings"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best[.]"); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) (holding use of "questionnaire" format typifies "brief or conclusory" testimony); *Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions"). The court acknowledges, however, that the use of such forms "is not a basis, in and of itself, [to] discount them as conclusory." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019) (emphasis added).

In addition, as indicated by the ALJ, the treatment notes from Dr. Mellick do not provide support for the marked physical limitations detailed in the physical capacities form. Dr. Mellick treated Ferguson for her sleep apnea. The court cannot find anything in Dr. Mellick's medical records to support these extreme physical limitations, other than her own subjective statements. (Tr. 622-56, 793-95). And Ferguson does not point the court to any such evidence, but only generally cites to all the treatment records. For example, regarding Dr. Mellick's opinions that Ferguson could sit upright for less than thirty minutes; stand for one hour at a time; and would

remain lying down, sleeping, or sitting with her legs propped at waist level for six hours during an eight-hour day, Dr. Mellick's records fail to portray he ever examined or treated Ferguson for limitations vis-à-vis her ability to sit or stand.

Rather, the vast majority of the treatment records consist of CPAP machine readings, medication management, and subjective reports from Ferguson.   There exist no physical examinations or other sort of testing that would portray any of the need for the marked limitations opined by Dr. Mellick.   A physician's report "may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford*, 363 F.3d at 1159 (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)).

To be sure, Ferguson consistently complained of fatigue or restless sleep, (tr. 622, 633, 637), and Dr. Mellick conducted various sleep studies.   (Tr. 418–21, 426–29, 631–32, 634, 642–44, 647–56).   However, Dr. Mellick's records depict that Ferguson routinely denied experiencing chest pain, shortness of breath when walking, difficulty walking, muscle aches, muscle weakness, arthralgias, or joint pain.   (Tr. 623, 629, 634, 640, 707).   Moreover, as the ALJ noted, Ferguson reported in January 2015 that her symptoms had improved after using a CPAP machine.   (Tr. 637).   Ferguson complained in July and October 2015 that her symptoms had worsened; however, Dr. Mellick's records indicate she "ha[d] not been using her [CPAP] machine like she is supposed to."   (Tr. 623).   Therefore, Dr. Mellick's records fail to buttress his opinions

12

regarding Ferguson's ability to stand and walk.   In any event, as previously discussed, the ALJ restricted Ferguson to unskilled work not requiring complex instructions or procedures "[i]n view of [her] . . . complaints of drowsiness."   (Tr. 20).

Dr. Mellick's opinions that Ferguson would be off-task 100 percent of an eight-hour day and absent thirty days in a thirty-day period reflect no support for the same reason.   Dr. Mellick's records lack any indication that he ever evaluated Ferguson vis-à-vis her capacity to focus or concentrate.   Indeed, his records depict Ferguson consistently denying irritability, depression, anxiety, panic attacks, sleep disturbances, paranoia, and suicidal thoughts.   (Tr. 623, 629, 634, 640).   Dr. Mellick's records thus fail to buttress his opinions regarding Ferguson's concentration and absenteeism.

Other physicians' records further undermine Dr. Mellick's opinions.   For example, Dr. Brackett's November 2015, March 2017, and January and March 2018 rheumatic examinations of Ferguson failed to reveal any abnormalities in her shoulders, elbows, hips, or knees.   (Tr. 713, 718, 945–46, 953–54).   Likewise, other physician's records portray that Ferguson routinely denied, or failed to exhibit, gait abnormalities during the relevant period.   (Tr. 48, 59, 63, 76, 442, 547, 551, 568, 623, 629, 634, 640, 707, 929).   Finally, October 2015, and October and November 2017 testing of Ferguson's cardiovascular system displayed unremarkable results.   (Tr. 597–98, 693, 770).   Ferguson's normal manifestations undermine Dr. Mellick's opinions that she

cannot sit for greater than thirty minutes at a time or stand for greater than one hour at a time.

Additional records countermand Dr. Mellick's opinions that Ferguson would remain off-task 100 percent of an eight-hour day and fail to report to work thirty days in a thirty-day period. As the ALJ observed, Ferguson's prior "absenteeism from work . . . appears . . . due to [her] substance abuse, for which she has received inpatient treatment."[4] (Tr. 18). The ALJ further noted that Ferguson reported being one-year sober" in July 2016, and the record does not depict she has experienced recent relapses. (*Id.*, tr. 781). Indeed, Ferguson stated she was "steady", and "denie[d] any worsening anxiety and/or depressive symptoms" at an October 2016 follow-up appointment at Carr Mental Wellness. (Tr. 778).

Ferguson complained of worsening symptoms at a January 2017 follow-up appointment at Carr Mental Wellness; however, she presented as "pleasant and cooperative" with a "euthymic" mood. (Tr. 766, 768). In addition, her thought process manifested as "linear and goal directed." (Tr. 768). Ferguson also displayed no paranoia or psychosis; her cognition remained "grossly intact"; and her insight and judgment "good." (*Id.*) Furthermore, Dr. Vollberg's notes indicate Ferguson routinely denied depression, anxiety, mania, paranoia, and suicidal ideation, (tr. 679,

---

[4] Ferguson's May 2015 alcohol abuse rehabilitation treatment records state she "ha[d] been missing work" due to alcohol consumption. (Tr. 463).

683, 814, 824, 840, 845, 935, 941), or described her depression as "mild." (Tr. 804, 808). Accordingly, Dr. Mellick's opinions regarding Ferguson's mental capacity and absenteeism fail to accord with the medical evidence of record.

Finally, Dr. Mellick's opinions regarding Ferguson's ability to work invades the province of the ALJ and sustain no dispositive weight.

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources on issues such as the RFC and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017). That is, "the task of determining a claimant's . . . ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010). Pursuant to the foregoing reasons, the court finds Dr. Mellick's opinions remain unsupported. Substantial evidence thus supports the ALJ's assigning little weight thereto.[5]

---

[5] Ferguson submitted new evidence to the Appeals Council from Dr. Mellick that post-dated the ALJ's determination. Generally, a claimant may present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. §404.900(b)). The Appeals Council retains discretion to decline review of an ALJ's denial of benefits. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b) (2012). However, the Appeals Council must consider evidence that is (1) new, (2) material, and (3) chronologically relevant. *Ingram*, 496 F.3d at 1261 (citing 20 C.F.R. § 404.970(b)).

New evidence is material if it is relevant and probative "so that there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted). The evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(a)(5); *see also Keeton v. Dep't of Health & Human Servs.*,

## B. The ALJ Failed to Specify Good Cause for Discounting the Opinion of Dr. Vollberg

Dr. Vollberg, a physician at the Center for Comprehensive Medicine, treated Ferguson for various conditions for the period 2015 to 2018. (Tr. 546–73, 676–90, 801–45, 928–41). On January 29, 2018, Dr. Vollberg completed a Mental Health Source Statement. (Tr. 875-76). The statement consists of the following questions to which Dr. Vollberg circled "yes" or "no":

- Can Ms. Ferguson understand, remember or carry out very short and simple instructions?
- Can Ms. Ferguson maintain attention, concentration and/or pace for periods of at least two hours?

---

21 F.3d 1064, 1066 (11th Cir. 1994) (holding that the Appeals Council must evaluate the entire record, including the new and material evidence submitted to it if it relates to the period on or before the date of the ALJ hearing decision).

On October 1, 2018, Ferguson presented at Dekalb Neurology and Sleep Center for a follow-up appointment with Dr. Mellick. (Tr. 107). Ferguson reported she "ha[d] been doing well", though she experienced "a lot of sleepiness recently." (*Id.*) Dr. Mellick prescribed a transdermal patch for her restless leg syndrome. (Tr. 107–08).

The Appeals Council denied review in this case on July 18, 2019. (Tr. 1). The Appeals Council stated:

> [Ferguson] submitted medical records from . . . Dekalb Neurology [and] Sleep [Center] dated October 1, 2018 to December 12, 2018 . . . . We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.

(Tr. 2).

This record fails to evince that substantial evidence did not support the ALJ's decision, as it does not speak to Ferguson's limitations during the relevant time period. Rather, Dr. Mellick's October 1, 2018, record simply depicts Ferguson's sleep-related complaints as of that date. In addition, this record does not speak to the source or severity of Ferguson's impairments during the period before the ALJ's decision. Accordingly, this record manifests as neither chronologically relevant nor material to the ALJ's assessment of her disability.

16

- Can Ms. Ferguson perform activities within a schedule and be punctual within customary tolerances?
- Can Ms. Ferguson maintain an ordinary routine without special supervision?
- Can Ms. Ferguson adjust to routine and infrequent work changes?
- Can Ms. Ferguson interact with supervisors?
- Can Ms. Ferguson interact with co-workers?
- Can Ms. Ferguson maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness?

(Tr. 875). Dr. Vollberg circled "yes" to all of the questions except the second, third and fifth. (Tr. 875). In addition, there is a notation written next to the second answer stating, "no to pace, will need frequent breaks," and a notation written next to the fifth answer stating, "no infrequent changes, she needs frequent breaks from routine to rest and regroup." (Tr. 875). Dr. Vollberg also stated Ferguson would be off-task 50 to 60 percent of the time during an 8-hour day and would be expected to miss "up to 30 days" of work during any 30-day period due to her psychological symptoms, but also noted it was "undetermined, [because] depending on episodal flare ups she could be out everyday or not at all some months." (Tr. 875). He listed the side effects of her medication as: dizziness, drowsiness, headaches, confusion, nausea and vomiting, blurred vision or double vision, feelings of nervousness or anxiety, loss of balance, confusion, loss of coordination, and insomnia. (Tr. 875-76).

That same day, Dr. Vollberg also completed a Physical Capacities Form, identical to the form completed by Dr. Mellick. (Tr. 877). Dr. Vollberg indicated Ferguson could sit upright in a standard chair for less than 30 minutes at one time, and she could

stand for less than 15 minutes at a time.   (*Id.*)   He further estimated Ferguson would be "lying down, sleeping, or sitting with legs propped up at waist level or above, due to her medical conditions" for four to seven hours[6] during an eight-hour daytime period. (*Id.*)   Dr. Vollberg opined Ferguson would be off-task 50 to 60 percent of the time during an eight-hour day, and it was undetermined how many days she would fail to report to work in a 30-day period due to her physical symptoms, but "up to 30 days at a time depending on episodal flareups."   (*Id.*)   He listed Parkinson's Disease as the condition causing these symptoms, and he recorded the side effects of her medication as the same as listed on his Mental Health Source Statement.   (*Id.*)

The ALJ assigned little weight to the opinions of Dr. Vollberg.   (Tr. 19-20). Regarding the Mental Health Source Statement, the ALJ noted that Dr. Vollberg is not a mental health professional.   (Tr. 15, 19).   The ALJ specifically discounted Dr. Vollberg's opinion that Ferguson could not maintain attention, concentration, or pace because Dr. Vollberg discerned a need for frequent breaks.   (Tr. 15).   Rather, the ALJ gave "good weight" to the state agency examining psychiatrist, Dr. Robert Estock, regarding her mental functioning; Dr. Estock opined Ferguson had mild difficulties in maintaining concentration, persistence or pace.   (Tr. 15, 19).   As for the Physical Capacities Form, the ALJ noted Dr. Vollberg was treating Ferguson for a sleep disorder

---

[6] Dr. Vollberg circled the range "4-7."   (Tr. 877).

and that on July 23, 2015, he noted she was "doing well with the CPAP" and characterized her fatigue as mild to moderate. (Tr. 19-20). The ALJ further stated that Dr. Vollberg's opinions remained "inconsistent with regard to whether [Ferguson's] limitations are physical or mental in nature." (Tr. 20). Finally, the ALJ noted the medication side effects Dr. Vollberg identified did not accord with his treatment records. (*Id.*)

As explained above, an ALJ must clearly articulate the reasons for assigning less than substantial weight to a treating physician's opinion. *Phillips*, 357 F.3d at 1240. When an ALJ fails to "state with at least some measure of clarity the grounds for his decision," the court should decline to affirm "simply because some rationale might have supported the ALJ's conclusion." *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (*per curiam*). In such a situation, "to say that [the ALJ's] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart*, 662 F.2d at 735 (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)) (internal quotation marks omitted).

At the outset, the court notes several incongruities in the ALJ's discussion of Dr. Vollberg's opinions. As afore-cited, in assessing the Physical Capacities Form the ALJ noted that Dr. Vollberg "was treating [Ferguson] for a sleep disorder." (Tr. 19). A review of Dr. Vollberg's treatment records demonstrates this statement remains

accurate but incomplete. Dr. Vollberg's records routinely portray that Ferguson presented at follow-up appointments for "[s]everal issues", (tr. 546, 550, 558, 563, 567, 684, 801, 805, 811, 816, 821, 833, 837, 842, 938), and he consistently assessed her with conditions numbering from eight, *see, e.g.*, tr. 547, to twenty-one, *see, e.g.*, tr. 807, 812, 933 – including, but not limited to, sleep-related conditions. *See, e.g.*, tr. 551, 555, 559, 564, 568, 802, 807, 822, 933, 939.[7] Dr. Vollberg thus completed the Physical Capacities Form upon treating Ferguson not only for a "sleep disorder," but for various conditions.

The ALJ stated he gave "little weight" to the opinions of Dr. Vollberg because "they are inconsistent with regard to whether the claimant's limitations are physical or mental in nature" (Tr. 20), but he failed to articulate how they were inconsistent. Certainly, the limitations could be caused by both her physical and mental impairments, and, as such, the fact that Dr. Vollberg lists the limitations in both opinions does not necessarily equate with inconsistency. Without more explanation from the ALJ, the court is left to speculate as to what this statement means and the reasons behind it. The Eleventh Circuit does not permit the court to make *post hoc* rationalizations when an ALJ fails to adequately explain the reasoning behind his decision. *See Tavarez v.*

---

[7] For example, among other conditions, Dr. Vollberg commonly assessed Ferguson with Parkinson's disease, depression, fibromyalgia, various vitamin deficiencies, hypothyroidism, rhinitis, and metabolic syndrome. *See, e.g.*, tr. 551, 555, 559, 564, 568, 802, 807, 822, 933, 939.

*Comm'r of Soc. Sec.*, No. 15-11860, 2016 WL 75424, at *7 (11th Cir. Jan. 7, 2016) ("[W]e conclude that the ALJ's clearly articulated grounds for his decision to discredit Tavarez's medical opinion evidence are not supported by substantial evidence. *See Winschel*, 631 F.3d at 1179.  To the extent that the Commissioner identifies other record evidence that supports the ALJ's decision, we do not know whether this evidence formed the basis of the ALJ's determinations, and we will not affirm 'simply because some rationale might have supported the ALJ's conclusions.' *See id.* at 1179."); *Dempsey v. Comm'r of Soc. Sec.*, 454 F. App'x 729, 732 (11th Cir. 2011) (rejecting the Commissioner's *post hoc* rationale that might have supported the ALJ's conclusion to discount a treating physician's opinion when "the ALJ did not offer this explanation in his decision.").

In addition, while the ALJ did render some specific findings regarding the reasons for discounting the mental health source statement (*i.e.*, Dr. Vollberg is not a mental health professional), the lack of explanation manifests especially pronounced vis-a-vis the opinions stated in the Physical Capacities Form.  Dr. Vollberg is an internal medicine doctor who treated Ferguson for a number of months.  The ALJ's opinion does not provide any discussion of Dr. Vollberg's medical records, other than noting that Ferguson was doing well on her CPAP machine and her fatigue was mild to moderate.  Dr. Vollberg's records provide far more physical examinations and findings.  (Tr. 546-98).  There also exist other medical records from other doctors with physical findings that the ALJ failed to discuss in his opinion.  That being said,

the court does not make any findings as to whether the medical records from Dr. Vollberg or other doctors support Dr. Vollberg's opinions.   As discussed above, that exercise falls within the province of the ALJ to make in the first instance.

In short, the ALJ did not sufficiently develop the reason for assigning "little weight" to Dr. Vollberg's opinions.   As a treating physician, his opinion testimony warrants substantial weight unless the Commissioner articulates good cause for assigning the lesser weight.   Because the ALJ failed in this regard, the decision does not conform with the correct legal standards and remand is appropriate.   Nevertheless, the court will review several of Ferguson's remaining contentions, finding them unwarranted.

## II.   The ALJ Properly Found Severe Impairments at Step Two and Considered Ferguson's Non-Severe Impairments In Formulating Her RFC

Ferguson contends the ALJ improperly designated as non-severe the following impairments she suffered: Parkinson's disease, anxiety disorder, central annular tear at L3-L4, disc protrusion at L2-L3 and L3-L4, REM sleep behavior disorder, fatigue, narcolepsy, migraine headaches, mitral valve prolapse, fibromyalgia, asthma, metabolic syndrome, osteoarthritis, psoriatic arthropathy, and diaphragmatic hernia.   Relatedly, Ferguson maintains the ALJ improperly failed to consider these impairments in assessing her RFC.   For several reasons, Ferguson's arguments fail.

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any *medically determinable physical or mental impairment* which . . . has lasted or can be expected to last for a continuous period of *not less than 12 months*." 42 U.S.C. § 423(d)(1)(A) (emphasis in original); *see* 20 C.F.R. § 404.1505(a). Both the impairment(s) and the inability to work must last for at least twelve consecutive months. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 404.1509; *Barnhart v. Walton*, 535 U.S. 212, 217–20 (2002).

The Social Security Handbook § 601 defines a "medically determinable" physical or mental impairment as:

> an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by objective medical evidence from an acceptable medical source. Objective medical evidence is signs, laboratory findings, or both. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).

Social Security Administration, Social Security Handbook, § 601, available at https://www.ssa.gov/OP_Home/handbook/handbook.06/handbook-0601.html. Further, Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, emphasizes that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); *see also*

23

20 C.F.R. §§ 404.1502(c), (g), (i) (defining laboratory findings, signs, and symptoms); 404.1527(a)(1) (evaluating opinion evidence); 404.1529 (evaluating symptoms).

Furthermore, a diagnosis alone does not indicate a disability or limitations on a claimant's ability to work.  *See Moore*, 405 F.3d at 1213 n.6 ("[T]he mere existence of [ ] impairments does not reveal the extent to which they limit [a claimant's] ability to work. . . ."); *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662–63 (11th Cir. 1987) (diagnosis does not equate to existence of impairment); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

As an initial matter, "step two [of the sequential process] requires only a finding of 'at least one' severe impairment to continue on to the later steps."  *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) (per curiam) (citing *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)).  Where an ALJ recognizes at least one severe impairment and proceeds to step three of the sequential evaluation process, there exists no *per se* requirement to identify additional impairments at the second step where the decision demonstrates the ALJ properly considered all impairments at subsequent steps.  *Id.*; *see also Williams v. Berryhill*, No. 17-00260-N, 2018 WL 1092019, *5 (S.D. Ala. Feb. 28, 2018); *Vangile v. Comm'r, Soc. Sec. Admin.*, 695 F. App'x 510, 513–14 (11th Cir.

24

2017); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853–54 (11th Cir. 2013) (any error in the severity finding rendered harmless by ALJ's later discussion of objective evidence regarding impairment and symptoms; ALJ thus performed analysis that would have been required had he determined a severe impairment at step two); *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824–25 (11th Cir. 2010) ("Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe" and even if the ALJ erred by not recognizing every severe impairment, the error was harmless since he found at least one such impairment).

In this case, the ALJ considered all the medical evidence in combination, as he referenced Ferguson's combination of impairments at step three, (tr. 15), and stated he considered "all symptoms" in assessing her RFC.  (Tr. 16).  Further, as described previously, the ALJ found that Ferguson's severe impairments include degenerative disc disease, obstructive sleep apnea, migraine headaches, obesity, psoriatic arthritis, and temporomandibular joint syndrome.  (Tr. 13).  The ALJ thus found at least one severe impairment at step two in accordance with *Tuggerson-Brown*.  Nevertheless, the court will assess whether the ALJ erred in determining Ferguson did not manifest the severe impairments she asserts.

### A. The ALJ Clearly Assessed Ferguson's Parkinson's Disease, Anxiety Disorder, Central Annular Tear at L3-L4, Disc Protrusion at L2-L3 and L3-L4, Fatigue, Narcolepsy, Migraines, Fibromyalgia, Asthma, Psoriatic Arthropathy, and Osteoarthritis at Step Two and in Formulating her RFC

The ALJ considered Ferguson's Parkinson's disease, anxiety disorder, central annular tear at L3-L4, disc protrusion at L2-L3 and L3-L4, fatigue, narcolepsy, migraines, fibromyalgia, asthma, psoriatic arthropathy, and osteoarthritis either individually or as grouped within impairments the ALJ found severe. Furthermore, the ALJ properly "considered all symptoms" in formulating Ferguson's RFC. (Tr. 16).

As for Ferguson's Parkinson's disease ("PD"), the ALJ considered this impairment individually in finding it did not constitute a severe impairment. The ALJ acknowledged that Ferguson's medical records variously reference her PD diagnosis. (Tr. 14). For example, Ferguson's May 2015 alcohol abuse rehabilitation treatment records indicate she was diagnosed with PD in 2009. (Tr. 449). Dr. Carlton M. Vollberg, a physician at the Center for Comprehensive Medicine, noted Ferguson's 2009 diagnosis and consistently assessed her with PD in his treatment records from the period 2015 to 2018. (Tr. 546–47, 550–51, 555, 558, 560, 563, 564, 567, 568, 677, 681, 685, 802, 806–07, 811–12, 822, 838, 843, 929, 933, 939).

However, as the ALJ correctly noted, Dr. Anthony P. Nicholas – the same doctor who diagnosed Ferguson with PD in 2009 – noted in June 2015 that an examination of Ferguson raised "a question regarding her presumptive diagnosis and concern that she

may not have [PD]." (Tr. 540). Dr. Nicholas observed that Ferguson had recently undergone alcohol abuse rehabilitation treatment and remained sober for a period of two weeks. (*Id.*) He further noted that Ferguson presented "no new PD-like symptoms" since her last visit in 2013. (*Id.*) A July 2015 brain scan depicted "[s]ubtle asymmetric thinner appearance of the posterior right putamen, [which], in the right clinical scenario, could relate to early Parkinsonian syndrome."[8] (Tr. 543). Similarly, Ferguson's May 2016 Dekalb Neurology and Sleep Center records describe her PD as "Self-Limited/Minor." (Tr. 704).

Based upon the foregoing evidence, substantial evidence supports the ALJ's conclusion that Ferguson's PD constitutes a non-severe impairment. Furthermore, the ALJ did not err because he properly considered Medical Listing 11.06 for Parkinsonian syndrome in determining Ferguson's disability.[9] (Tr. 16). In addition, the ALJ stated he "considered all symptoms" in formulating Ferguson's RFC. (Tr. 16).

---

[8] The putamen refers to "a large structure located within the brain . . . involved in a very complex feedback loop that prepares and aids in movement of the limbs. . . . Lesions on the brain due to Parkinson's disease can affect the putamen and cause involuntary muscle movements or tremors." https://www.healthline.com/human-body-maps/putamen#1 (last visited July 14, 2020).

[9] Medical Listing 11.06 requires a claimant to exhibit – "despite adherence to prescribed treatment for at least 3 consecutive months" – either:

> A. Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.
>
> OR

As for Ferguson's anxiety disorder, the ALJ specifically concluded this impairment – "considered singly and in combination" with her other impairments – caused no more than a "minimal limitation in [her] ability to perform basic mental work activities", and thus remained non-severe.  (Tr. 14).  Furthermore, the ALJ properly reviewed Ferguson's medical records pursuant to Medical Listing 12.00 and the four broad functional areas known as the "paragraph B" criteria.[10]  To be sure, Ferguson

---

B. Marked limitation in physical functioning, and in one of the following:
1. Understanding, remembering, or applying information; or
2. Interacting with others; or
3. Concentrating, persisting, or maintaining pace; or
4. Adapting or managing oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.06 (internal citations omitted).

As the ALJ noted, in September 2016 Certified Registered Nurse Practitioner Laura P. Lieb prescribed Ferguson a "Rolling Walker with handbrakes and seat medically necessary for Parkinson['s] disease and gait disorder."  (Tr. 616).  However, the ALJ properly observed that Ferguson presented at a March 2017 medical appointment using a cane rather than her prescribed walker.  (Tr. 863).  Moreover, Ferguson routinely denied, or failed to exhibit, gait abnormalities.  (Tr. 48, 59, 63, 76, 442, 547, 551, 568, 623, 629, 634, 640, 707, 929).   In addition, Ferguson stated her hobbies include playing music, writing, reading, drawing, watching television, and playing word games.  (Tr. 329). Accordingly, as the ALJ discussed, the record evidence fails to portray that Ferguson exhibits the limitations described in Medical Listing 11.06.

[10]  The paragraph B criteria require a claimant to have at least two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  *Id.* §§ 12.02(B), 12.03(B), 12.04(B), 12.06(B), 12.07(B), 12.08(B).

"Marked" means "more than moderate but less than extreme"; marked restriction occurs when the degree of limitation seriously interferes with a claimant's ability to function "independently, appropriately, effectively, and on a sustained basis."  *Id.* § 12.00(C); *see* 20 C.F.R. § 416.920a(c)(4) (describing a five-point scale used to rate the degree of limitation: none, mild, moderate, marked, and extreme). "Episodes of decompensation" constitutes "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in

reported experiencing anxiety during her appointments with various health care providers. (Tr. 557, 560, 565, 569, 711, 716, 943, 951). Nonetheless, Ferguson frequently denied the same throughout the relevant period. (Tr. 422, 549, 553, 623, 629, 634, 640, 679, 683, 707, 778, 814, 824, 840, 845, 935, 941).

Based upon the foregoing records, substantial evidence supports the ALJ's conclusion that Ferguson's anxiety does not constitute a severe impairment. In any event, "in view of [her] mental impairments", the ALJ restricted Ferguson to the performance of unskilled work not requiring complex instructions or procedures. (Tr. 20). Similarly, the ALJ limited Ferguson to no more than occasional contact with the general public. (Tr. 16). Accordingly, the ALJ committed no error in finding Ferguson's anxiety non-severe and properly considered this impairment in formulating her RFC.

As for Ferguson's central annular tear at L3-L4 and disc protrusion at L2-L3 and L3-L4, the ALJ considered these impairments under the umbrella of her degenerative disc disease, which the ALJ concluded constitutes a severe impairment. (Tr. 13). The ALJ discussed various imaging tests of Ferguson's lower back, and specifically cited exhibits containing records of the alleged erroneously omitted impairments. (Tr. 13)

---

performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). To meet the criterion of "repeated" episodes of "extended duration," a claimant must have three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*

(citing exhibits 1F, 7F, 29F); (Tr. 407–08, 414–16, 603–15, 798).   Therefore, substantial evidence demonstrates the ALJ's recognition that Ferguson's severe impairment of degenerative disc disease fairly encompasses the additional, related impairments Ferguson asserts.   Ferguson's challenge thus fails because the ALJ actually considered her spinal impairments as grouped within degenerative disc disease.   Moreover, the ALJ restricted Ferguson to the performance of unskilled work "[i]n light of [her] complaints of pain."   (Tr. 18).   Alternatively, the ALJ did not err because he properly considered Medical Listing 1.04 for disorders of the spine in determining Ferguson's disability.[11]   (Tr. 16).

---

[11]  Medical Listing 1.04 requires a claimant to exhibit:

> compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>>
>> OR
>>
>> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>>
>> OR
>>
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.

As for Ferguson's fatigue, the ALJ considered this impairment under the umbrella of her obstructive sleep apnea, which the ALJ found severe. The ALJ observed that Ferguson "had been diagnosed with obstructive sleep apnea . . . long before the alleged onset date of disability." (Tr. 13). "People with obstructive sleep apnea often experience severe daytime drowsiness [and] fatigue . . . ." *Obstructive Sleep Apnea*, MayoClinic.com, https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090#:~:text=daytime%20fatigue%20and%20sleepiness.,daytime%20drowsiness%2c%20fatigue%20and%20irritability. (last visited July 15, 2020). Accordingly, the ALJ's recognition of Ferguson's severe impairment of obstructive sleep apnea subsumes Ferguson's fatigue. Furthermore, as indicated previously, the ALJ restricted Ferguson to unskilled work not requiring complex instructions or procedures "[i]n view of [her] . . . complaints of drowsiness." (Tr. 20). For these reasons, substantial evidence supports the ALJ's consideration of Ferguson's fatigue.

As for Ferguson's narcolepsy, the record lacks sufficient objective evidence to establish this condition as a severe impairment. A January 2017 Dekalb Neurology

---

*Id.* § 1.04 (internal citation omitted).

As the ALJ observed, despite her complaints of back pain, the record evidence fails to portray that Ferguson sustained any of the conditions enumerated in § 1.04 for a twelve-month period. (Tr. 16).

and Sleep Center record portrays that Dr. Gary Allen Mellick assessed Ferguson with narcolepsy in May 2016 and prescribed her medication.   (Tr. 704–05).   The ALJ discussed this record at step two of the sequential analysis.   (Tr. 14).   Similarly, Dr. Vollberg assessed Ferguson with narcolepsy in March 2017.   (Tr. 843).

Given Dr. Mellick's and Dr. Vollberg's mere assessments of narcolepsy, and the lack of any evidence this impairment limited Ferguson's ability to work, the ALJ properly found Ferguson's narcolepsy non-severe.   *See Moore*, 405 F.3d at 1213 n.6; *Wilkinson ex rel. Wilkinson*, 847 F.2d at 662–63; *Mansfield*, 395 F. App'x at 531; *Osborn*, 194 F. App'x at 667.   Moreover, the ALJ "considered all symptoms" in precluding Ferguson from climbing ropes, ladders, and scaffolds; and working at unprotected heights or with hazardous machinery.   (Tr. 16).   Therefore, substantial evidence supports the ALJ's consideration of Ferguson's narcolepsy.

As for Ferguson's migraines, the ALJ found this impairment severe.   (Tr. 13). Accordingly, Ferguson's contention that the ALJ improperly considered her migraines at step two remains meritless.   Further, in assessing Ferguson's RFC, the ALJ noted that she "has had migraine headaches since she was a teenager and . . . she performed skilled work despite any pain from such headaches."   (Tr. 18).   Nonetheless, the ALJ restricted Ferguson to the "performance of unskilled work such that [her] pain . . . would have less of an effect than if [she] were required to perform complex

procedures or follow complex instructions." (Tr. 18). Therefore, the ALJ clearly considered Ferguson's migraines in formulating her RFC.

As for Ferguson's fibromyalgia, the ALJ correctly noted that Dr. Vollberg assessed Ferguson as suffering the impairment, but "did not identify any positive tender points and . . . did not exclude other causes of her symptoms." (Tr. 13) (citing Tr. 546–598). Without more, Dr. Vollberg's assessment remains insufficient to establish Ferguson's fibromyalgia as a severe impairment. Accordingly, the ALJ properly concluded that Ferguson does not satisfy SSR 12-2p, which delineates considerations attendant to the evaluation of fibromyalgia as a medically determinable impairment. SSR 12-2p, 2012 WL 3104869 (July 25, 2012).[12] Furthermore, as aforenoted, the ALJ

---

[12] SSR 12-2p states the Social Security Administration "will find that a person has an MDI [medically determinable impairment] of FM [fibromyalgia] if the physician diagnosed FM and provides the evidence we describe in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." SSR 12–2p, 2012 WL 3104869, at *2 (July 25, 2012). Sections II.A and II.B include two sets of criteria for diagnosing fibromyalgia -- the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia and the 2010 ACR Preliminary Diagnostic Criteria. *Id.*

The first set of criteria (1990) requires the claimant to demonstrate: (1) a history of widespread pain; (2) at least 11 positive tender points   on physical examination and the positive tender points must be found bilaterally, on the left and right sides of the body and both above and below the waist; and (3) evidence that other disorders which could cause the symptoms or signs were excluded. *Id.* at *2-3 (§ II.A.1.–3. criteria).

The second set of criteria (2010) requires the claimant to demonstrate: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. *Id.* at *3.

Critically, the SSR 12-2p provides:

33

precluded Ferguson from performing skilled work due to her pain.   (Tr. 18).
Therefore, substantial evidence supports the ALJ's consideration of Ferguson's
fibromyalgia.

As for Ferguson's asthma, the ALJ summarized her history thereof and correctly
noted that in January 2017, Dr. Michael C. Hollie assessed Ferguson with "mild[,]
intermittent" asthma.   (Tr. 13, 791).   Similarly, in June 2015 Dr. Vollberg noted that
Ferguson presented "without complaints" regarding her asthma and did not require
medication "very often."   (Tr. 13, 558).   Likewise, Dr. Vollberg observed in August
2016 and January 2018 that Ferguson was "doing well and without complaints" vis-à-
vis her asthma.   (Tr. 805, 928).   Dr. Vollberg also indicated in January 2017 that
Ferguson's "intermittent asthma" remained "all ok!"   (Tr. 833).

Finally, the ALJ specifically considered Ferguson's asthma in formulating her
RFC:   "In view of [Ferguson's] nonsevere impairment of asthma, the undersigned has
limited [her] with regard to exposure to respiratory irritants[,] and exposure to extreme
heat or cold."   (Tr. 20).   Alternatively, the ALJ properly considered Ferguson's asthma

---

[W]e cannot rely upon the physician's diagnosis alone.   The evidence must document
that the physician reviewed the person's medical history and conducted a physical
exam.   We will review the physician's treatment notes to see if they are consistent with
the diagnosis of FM, determine whether the person's symptoms have improved,
worsened, or remained stable over time, and establish the physician's assessment over
time of the person's physical strength and functional abilities.

*Id.* at *3.

in light of Medical Listing 3.03.[13]   For these reasons, Ferguson's challenge to the ALJ's consideration of her asthma fails.

As for Ferguson's psoriatic arthropathy and osteoarthritis, the ALJ considered these impairments concurrently with her psoriatic arthritis, which the ALJ deemed severe.   (Tr. 13).   The court discerns no meaningful medical distinction between psoriatic arthritis and psoriatic arthropathy.   *See Simple Definitions for Common RA Medical Terms*,   WebMD.com,   https://www.webmd.com/rheumatoid-arthritis/definitions-rheumatoid-arthritis-terms (last visited July 15, 2020) ("Arthropathy . . . is the term for any disease of [the] joints. Doctors may use it instead of 'arthritis.'"); Psoriatic Arthropathy, Google, https://www.google.com (yielding search results for "psoriatic arthritis").

Further, while psoriatic arthritis and osteoarthritis remain distinct, both impairments manifest joint pain, swelling, stiffness, and reduced flexibility.   *See Psoriatic Arthritis (PsA) vs. Osteoarthritis (OA): Which Is It?*, healthline.com, https://www.healthline.com/health/psoriatic-arthritis-vs-osteoarthritis (last visited July 16, 2020).   Significantly, upon Dr. Richard Brackett's November 2015 and March 2017 rheumatic examinations of Ferguson, she exhibited joint pain in her right wrists,

---

[13]   Medical Listing 3.03 requires, in part, "[e]xacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart."   *Id.* § 3.03.   As the ALJ correctly observed, the record portrays that Ferguson "has not had exacerbations or complications of asthma requiring hospitalizations."   (Tr 16).

and in her left and right fingers. (Tr. 713, 718). Likewise, upon examination in January and March 2018, Ferguson manifested joint pain in her right wrist, and joint pain and swelling in her right and left fingers. (Tr. 946, 953–54). Dr. Brackett's March 2017, and January and March 2018 records note he "c[ould] not reproduce triggering of [Ferguson's] right 4th finger." (Tr. 719, 946, 954). Finally, Ferguson reported experiencing psoriasis during her March 2017, and January and March 2018 appointments. (Tr. 716, 943, 951). Based upon the foregoing, the ALJ fairly assessed Ferguson's osteoarthritis as grouped within her severe impairment of psoriatic arthritis. And, to recount, the ALJ formulated Ferguson's RFC "[i]n light of [her] complaints of pain." (Tr. 18). For these reasons, substantial evidence supports the ALJ's assessment of Ferguson's psoriatic arthropathy and osteoarthritis.

In sum, the ALJ did not err because he identified severe impairments at step two of the sequential analysis and proceeded to step three. Moreover, the ALJ properly assessed Ferguson's Parkinson's disease, anxiety disorder, narcolepsy, fibromyalgia, and asthma as non-severe impairments at step two; and considered these impairments in formulating her RFC. Relatedly, the ALJ fairly evaluated Ferguson's central annular tear at L3-L4, disc protrusion at L2 and L3, fatigue, psoriatic arthropathy, and osteoarthritis as grouped within the severe impairments he identified at step two; thus, the ALJ evaluated these impairments in formulating Ferguson's RFC.

**B. The Medical Evidence of Record Fails to Portray that Ferguson's Mitral Valve Prolapse, Metabolic Syndrome, Diaphragmatic Hernia, and REM Sleep Behavior Disorder Constitute Medically Determinable Severe Impairments**

The ALJ did not discuss Ferguson's mitral valve prolapse, metabolic syndrome, diaphragmatic hernia, or REM sleep behavior disorder at step two of the sequential analysis, and, accordingly, did not reflect these impairments in Ferguson's RFC formulation.   Because the medical evidence of record fails to portray these conditions constitute medically determinable severe impairments, the court finds no error in the ALJ's assessment.

As previously elaborated, the ALJ cannot find the claimant disabled based upon his or her symptoms "unless medical signs and laboratory findings demonstrate the existence of a medically determinable impairment."   *Stewart v. Colvin*, No. 7:14-CV-898-KOB, 2015 U.S. Dist. LEXIS 74312, *25–26 (N.D. Ala. June 9, 2015).   Thus, the ALJ need not assess a condition which the claimant fails to establish as a medically determinable severe impairment.

Section 404.1521 of the Regulations elaborates this principle:

If [the claimant is] not doing substantial gainful activity, [the ALJ] will then determine whether [the claimant] ha[s] a medically determinable physical or mental impairment(s). [The claimant's] impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. [The ALJ] will not use [the claimant's] statement of symptoms, a

diagnosis, or a medical opinion to establish the existence of an impairment(s). *After [the ALJ] establish[es] that [the claimant] ha[s] a medically determinable impairment(s), then [the ALJ] determine[s] whether [the claimant's] impairment(s) is severe.*

20 C.F.R. § 404.1521 (emphasis added); *see Mathis v. Berryhill*, No. 4:17-cv-00472-LSC, 2019 U.S. Dist. LEXIS 14660, at *7 (N.D. Ala. Jan. 30, 2019) ("Because Plaintiff bore the burden of proving she had a severe impairment, she thus had the burden of establishing the prerequisite for finding a severe impairment, i.e., the existence of a medically determinable impairment."). Ferguson fails to establish the afore-cited conditions constitute medically determinable severe impairments.

As for Ferguson's mitral valve prolapse,[14] the record lacks any objective evidence thereof and portrays that Ferguson self-reported this condition. For example, in her alcohol abuse rehabilitation treatment records, Ferguson reported she was diagnosed with a "prolapsed valve" as a teenager. (Tr. 462, 465). Similarly, Ferguson reported a history of "MVP [mitral valve prolapse]" during a May 2015 follow-up appointment with Dr. Vollberg. (Tr. 567). Dr. Vollberg ordered a chest screening examination, the results of which reflect no indication of mitral valve prolapse. (Tr. 523). Notably, an October 2017 echocardiography report depicted Ferguson's "mitral valve morphology"

---

[14] "Mitral valve prolapse occurs when the flaps (leaflets) of the heart's mitral valve bulge (prolapse) like a parachute into the heart's left upper chamber (left atrium) as the heart contracts. Mitral . . . valve prolapse sometimes leads to blood leaking backward into the left atrium, a condition called mitral valve regurgitation." https://www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/symptoms-causes/syc-20355446 (last visited July 15, 2020).

as "normal with fully mobile leaflets." (Tr. 693). The report also noted "[n]o significant valvular regurgitation or stenosis." (*Id.*) Absent any supporting objective medical evidence, Ferguson fails to establish her mitral valve prolapse constitutes a medically determinable severe impairment. The ALJ thus did not err in failing to consider this condition at step two of the sequential analysis or in formulating Ferguson's RFC.

As for Ferguson's metabolic syndrome,[15] Dr. Vollberg consistently assessed Ferguson with this condition throughout the period 2015 to 2018. (Tr. 551, 559, 564, 677, 681, 802, 807, 812, 817, 834, 838, 843, 929, 939). Dr. Vollberg also noted in August 2017 that Ferguson's "A1c was 6.1",[16] and advised her to "watch [her] diet" and "avoid sweets." (Tr. 680). But absent any indication as to the effect of Ferguson's metabolic syndrome upon her functioning, Dr. Vollberg's assessments and Ferguson's August 2017 A1C level remain insufficient to establish this condition as a

---

[15] Metabolic syndrome refers to "a group of risk factors that raises [the] risk for heart disease and other health problems, such as diabetes and stroke." https://www.nhlbi.nih.gov/health-topics/metabolic-syndrome (last visited July 15, 2020). "These conditions include increased blood pressure, high blood sugar, excess body fat around the waist, and abnormal cholesterol or triglyceride levels." https://www.mayoclinic.org/diseases-conditions/metabolic-syndrome/symptoms-causes/syc-20351916 (last visited July 15, 2020).

[16] The A1C test refers to "a blood test that provides information about [the] average levels of blood glucose, also called blood sugar, over the past 3 months. The A1C test can be used to diagnose type 2 diabetes and prediabetes. The A1C test is also the primary test used for diabetes management." https://www.niddk.nih.gov/health-information/diagnostic-tests/a1c-test (last visited July 15, 2020). An A1C level between 5.7 to 6.4 percent may indicate prediabetes. *Id.*

medically determinable severe impairment.    Therefore, the ALJ did not err in failing to discuss this condition in his opinion.[17]

As for Ferguson's diaphragmatic hernia,[18] Dr. Vollberg's July and October 2017, and February 2018, treatment records constitute the sole evidence thereof.    Dr. Vollberg assessed Ferguson with a diaphragmatic hernia during these appointments, (tr. 677, 685, 933); however, the record fails to portray Ferguson was otherwise examined or treated for this condition.    Because Dr. Vollberg's assessments alone remain insufficient to establish Ferguson's diaphragmatic hernia as a medically determinable severe impairment, the ALJ properly did not discuss this condition in assessing her disability.

As for Ferguson's REM sleep behavior disorder,[19] the sole record evidence thereof constitutes 2016 and 2017 sleep study records in which Dr. Amy W. Amara diagnosed Ferguson with the impairment and prescribed her medication to regulate it.

---

[17] Furthermore, the ALJ found Ferguson's obesity constitutes a severe impairment.  And as afore-cited, "excess body fat around the waist" constitutes a risk factor of metabolic syndrome. https://www.mayoclinic.org/diseases-conditions/metabolic-syndrome/symptoms-causes/syc-20351916 (last visited July 15, 2020).

[18] A diaphragmatic hernia "occurs when one or more of [the] abdominal organs move upward into [the] chest through a defect (opening) in the diaphragm." https://www.healthline.com/health/diaphragmatic-hernia (last visited July 15, 2020).

[19] REM (rapid eye movement) sleep behavior disorder refers to "a sleep disorder in which [one] physically act[s] out vivid, often unpleasant dreams with vocal sounds and sudden, often violent arm and leg movements during REM sleep."  https://www.mayoclinic.org/diseases-conditions/rem-sleep-behavior-disorder/symptoms-causes/syc-20352920 (last visited July 15, 2020).

(Tr. 911, 916, 924).   However, Dr. Amara's records do not indicate the extent to which Ferguson's REM sleep behavior disorder interferes with her functioning, if at all. Absent further objective evidence of this condition, Ferguson fails to establish her REM sleep behavior disorder constitutes a medically determinable severe impairment.

In sum, the medical evidence of record fails to depict Ferguson's mitral valve prolapse, metabolic syndrome, diaphragmatic hernia, and REM sleep behavior disorder constitute medically determinable severe impairments.   Thus, the ALJ did not err in failing to consider these conditions at step two of the sequential analysis or in formulating Ferguson's RFC.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration.   The court declines to address the remaining issues presented by Ferguson.   *See Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (because one issue plaintiff raised warranted remand, the court need not consider the remaining issues); *accord Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986).

**DONE** this 29th day of July, 2020.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE